**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLISON MANGLE, AMY BRYAN, CRAIG BRYAN, AMANDA HUTCHINSON, and DANIEL HUTCHINSON, *individually and on behalf of those similarly situated*,         Plaintiffs,<br><br>v.<br><br>ROCKET CLOSE, LLC,         Defendant. | :<br>:<br>:   No. 5:24-cv-6025<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**O P I N I O N**
**Defendant's Motion for Summary Judgment, ECF No. 57 – Granted**
**Plaintiffs' Motions for Class Certification, ECF Nos. 59, 73 – Dismissed**

**Joseph F. Leeson, Jr.**                                 **June 23, 2026**
**United States District Judge**

## I.    INTRODUCTION

Plaintiffs Allison Mangle, Amy Bryan, Craig Bryan, Amanda Hutchinson, and Daniel Hutchinson bring this proposed class action against Defendant Rocket Close, LLC ("Rocket Close"). Plaintiffs allege that Rocket Close overcharged them for notary fees during loan refinancing closings, in violation of Pennsylvania law. Plaintiffs allege violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") and unjust enrichment. Rocket Close filed a Motion for Summary Judgment. For the following reasons, the Court grants the Motion.

II.    **BACKGROUND**

   A.  **Factual Background**

The following facts are from Plaintiffs' Statement of Undisputed Material Facts ("Pl. SUMF"), *see* ECF No. 90, Defendant's Statement of Undisputed Material Facts ("Def. SUMF"), *see* ECF No. 65-1, Plaintiffs' Response to the Defendant's Statement of Undisputed Material Facts ("Pl. Resp. to Def. SUMF"), *see* ECF No. 89, and Defendant's Response to the Plaintiffs' Statement of Undisputed Material Facts ("Def. Resp. to Pl. SUMF"), *see* ECF No. 91. Any factual disputes are denoted.

Defendant, Rocket Close, LLC ("Rocket Close") contracts with signing agents and independent contractors to complete numerous notarial services on behalf of mortgage lenders and other third parties who engage Rocket Close in residential lending transactions. *See* Pl. SUMF ¶ 1. "Rocket Close contracted with three independent, third-party notaries public (signing agents) to provide notarial services before, during, and following Plaintiffs' closings: (a) Elizabeth Steffy, who provided notarial services in connection with the Hutchinsons' 2020 closing; (b) Jill A. Fox, who provided notarial services in connection with Allison Mangle's 2022, the Hutchinsons' 2022, and the Bryans' 2022 closings; and (c) Linda DeRogatis, who provided notarial services in connection with Allison Mangle's 2022 resigning." Def. SUMF. ¶ 2. Rocket Close used its proprietary eClosing platform, Nexsys ClearSign ("ClearSign") to conduct remote closings in 2022 and had team members on standby for potential troubleshooting issues. *See id.* ¶¶ 4–5.

   1.  **Allison Mangle**

Allison Mangle ("Ms. Mangle") "refinanced her then-existing mortgage loan secured by property located at 3101 Vermont Street, Easton, Pennsylvania 18045, on or about September 11,

2022, with a new loan from Rocket Mortgage, LLC."[1] *Id.* ¶ 6. In August 2022, Ms. Mangle sought to "refinance her mortgage in order to obtain over $40,000 in cash for her wedding and lower the interest rate on her then-existing mortgage loan." *Id.* ¶ 7. On August 20, 2022, Rocket Mortgage issued Ms. Mangle a Loan Estimate that detailed, among other things, a line item for "Title–Notary's Fees $125" under the heading "Services You Can Shop For." *Id.* ¶ 8; *see also* Mangle Loan Est., ECF No. 57-18. Ms. Mangle read the Loan Estimate and testified that she understood that if she moved forward with the refinance loan with Rocket Mortgage, she would be charged a $125 notary fee, *see* Def. SUMF ¶ 9. However, Ms. Mangle later testified that Rocket Close did not disclose to her that the fee "was significantly overcharging what was allowed in the state of Pennsylvania" and she merely trusted that the $125 fee was appropriate. Allison Mangle Dep. 30:15-20, 31:13-18, ECF No. 57-17. Still, Ms. Mangle decided to refinance her mortgage with Rocket Mortgage after receiving the Loan Estimate. *See* Def. SUMF ¶ 10.

After Rocket Close received Ms. Mangle's closing documents from Rocket Mortgage, Rocket Close completed "a thorough check and review of them to confirm the loan amount, liens being paid, spelling of names, and whether any additional documents were needed for the closing." *Id.* ¶ 11. On August 22, 2022, "Rocket Close arranged for Jill Fox, a duly-licensed and certified notary public, to conduct the closing of Ms. Mangle's refinance transaction and provided Ms. Fox with Ms. Mangle's closing documents and additional information." *Id.* ¶ 12.

Before the closing, Rocket Close sent Ms. Mangle numerous emails, titled, "We're Getting Started on Your Title Documents;" "We're Handling Your Appraisal;" "Your Title Review is Complete;" "Your Closing Appointment." *Id.* ¶¶ 15–16; *see also* ECF No. 57-19. The

---

[1]     Rocket Close differs from Rocket Mortgage, ostensibly because one handles the mortgages and the other handles closings. Rocket Close is the Defendant here.

"Your Closing Appointment" email "provided Ms. Mangle with information related to her closing, including that it would be a remote closing, the date, time, and location of the closing; [Ms. Fox's] name and contact information; and an overview of what [Ms. Fox] would do to facilitate the closing." Def. SUMF ¶ 17. The email sent to Ms. Mangle on September 7, 2022, stated: "Jill Fox will connect with you virtually and walk you through signing your documents online;" and

> Prior to your closing, you will receive an update from your lender with direction to access the signing session at the scheduled time. Once logged in, your signing agent will connect with you via two-way audio/visual connection where you can see and speak to one another. You will then be presented with your closing documents to review and digitally sign. If you have questions during your closing, your signing agent can help clarify what's required of you at each step. Once completed, your closing documents will be sent to Rocket Close for review and recording.

*Id.* ¶ 18.

Rocket Mortgage sent Ms. Mangle another email on September 7, 2022, stating that her "Closing Disclosure" was available to review. *Id.* ¶ 20; *see also* ECF No. 57-20. Ms. Mangle reviewed the Closing Disclosure that day, including the line item providing the $125 notary fee. *See* Def. SUMF ¶ 21. "Ms. Mangle [read every available document, but] did not ask Rocket Close or Rocket Mortgage any questions about the contents of the Closing Disclosure, including the $125 notary fee, because she did not have any questions." *Id.* ¶¶ 22–23.

On September 8, 2022, Ms. Mangle received the "Settlement Statement" for her refinance. *Id.* ¶ 24; *see also* ECF No. 57-20. The Settlement Statement contained the line, "Notary's Fees to Amrock[2] LLC $125" under the heading "Title Charges & Escrow / Settlement Charges." Def. SUMF ¶ 25. Ms. Mangle testified that she fully read the Settlement Statement and did not ask any questions "because she understood the document and that it was disclosing

---

[2]    Amrock is now called Rocket Close. *See* ECF No. 32.

all the fees associated with her closing that would be paid using the proceeds of her refinance loan." *Id.* ¶¶ 26–27. Ms. Mangle did not initially consider the $125 fee as the deciding factor in her decision to proceed but testified later that "[i]t would have been if I had known that I could have gotten it cheaper." Def. SUMF ¶ 28; *but see* Mangle Dep. 73:19-23. Ms. Mangle did not pursue alternative providers of notary services before the closing, ostensibly because she "thought she had to use everything Rocket was giving [her]." Def. SUMF ¶ 29; *see also* Mangle Dep. 33:4–34:7.

Ms. Mangle's closing occurred remotely on September 11, 2022. *See* Def. SUMF ¶ 30. At the closing, Ms. Fox (a) "[v]erified Ms. Mangle's identity"; (b) "[e]xplained the contents of each document to Ms. Mangle"; (c) "[i]ndicated where Ms. Mangle needed to sign the documents"; (d) "[c]onfirmed various terms of Ms. Mangle's mortgage, including Ms. Mangle's interest rate, loan amount, cash-to-close amount, payoff details, and mortgage insurance details"; (e) "[n]otarized Ms. Mangle's signature"[3]; and (f) "[m]ade herself available to answer Ms. Mangle's questions." *Id.* ¶ 32. "Ms. Mangle did not ask Ms. Fox any questions about any fees, including the $125 notary fee, prior to or during the closing." *Id.* ¶ 33. During the closing, Mangle signed the Closing Disclosure, as well as the Settlement Statement, which provided:

> We/I have carefully reviewed the Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the Settlement

---

[3]    Rocket Close maintains that Ms. Fox notarized Ms. Mangle's signature in multiple places, *see* Def. SUMF ¶ 32(e), but Plaintiffs dispute this claim, alleging that "Ms. Fox notarized Ms. Mangle's signature on the Signature Affidavit and the Mortgage." Pl. Resp. to Def. SUMF ¶ 32(e). The Court notes this dispute and removes the later language of "in multiple places," although it notes that the parties agree that Ms. Fox notarized Ms. Mangle's signature in two places.

Statement. We/I authorize Amrock, LLC to cause the funds to be disbursed in accordance with this statement.[4]

*Id.* ¶¶ 36–38. Ms. Mangle testified that she did not think much about the notary fee before signing her Settlement Statement. *See id.* ¶ 56. "Ms. Mangle has no factual basis to assert that the $125 notary fee she authorized to be disbursed to Rocket Close from her loan proceeds was a deliberate overcharge." *Id.* ¶ 57. Ms. Mangle understood that the notary fee would cover the services provided with her closing and resigning and agreed that notaries should be paid for their time and services, traveling to the closing location, and notarizing her signatures. *See id.* ¶ 54. She also "agreed that Rocket Close should be paid for its time and efforts in assigning notaries to closings and for auditing the materials for completeness and correctness." *Id.* ¶ 55.

On November 3, 2022, Rocket Close informed Ms. Mangle that Northampton County required a wet-ink signature on her mortgage before it could be recorded. *See id.* ¶ 42. Rocket Close arranged for Ms. Linda DeRogatis, also a licensed and certified notary public, "to conduct Ms. Mangle's in-person resigning of her mortgage with a wet signature." *Id.* ¶ 43. Ms. DeRogatis completed various tasks, including "[t]ravel[ing] to the closing location"; "[p]rint[ing] and [b]r[inging] copies of Ms. Mangle's mortgage to the closing location"; "[n]otariz[ing] Ms. Mangle's wet-ink signature on the mortgage"; and "[m]a[king] herself available to answer Ms. Mangle's questions during the resigning." *Id.* ¶ 46. Ms. Mangle did not ask any questions during the resigning. *See id.* ¶ 47. "After the resigning, Ms. DeRogatis mailed the resigned mortgage to Rocket Close." *Id.* ¶ 48.

---

4    Although Plaintiffs contend that they dispute the statement, they provide the same statement and only dispute that it did not disclose any fees beyond the $125 notary fee. *See* Pl. Resp. to Def. SUMF ¶ 38. The Court notes that the parties do not dispute the content of the Settlement Statement.

The $125 notary fee was disbursed to Rocket Close. *See id.* ¶ 50. Rocket Close paid Ms. Fox and Ms. DeRogatis for their services in connection with Ms. Mangle's refinance loan closings.[5] *See* Def. SUMF ¶ 51; *see also* Pl. Resp. to Def. SUMF ¶ 51, *see also* ECF Nos. 57-22 (Ms. Fox's remittance file dated September 21, 2022), 57-23 (Ms. DeRogatis' remittance file dated November 16, 2022); *see also* ECF Nos. 65-9, 65-10 (same). Plaintiffs dispute that Rocket Close did not retain any of the $125 notary fee. *See* Def. SUMF ¶ 52; *see also* Pl. Resp. to Def. SUMF ¶ 52; *see also* Karyn Rea Dep. 147:15–148:25, ECF No. 57-15 (Testimony of Karyn Rea, a Rocket Close employee, that Rocket Close charged a flat fee for notary services and did not "itemize out a notarial act fee"). Plaintiffs maintain that "Rocket Close retained the fee to pay and derive benefit" from its contracts with the notaries. Pl. Resp. to Def. SUMF ¶ 52; *see also* ECF No. 81-5 (the Signing Agent Agreement that details compensation for notaries).

### 2. Amy and Craig Bryan

Much like Ms. Mangle, Amy Bryan ("Mrs. Bryan") and Craig Bryan ("Mr. Bryan") (collectively, "the Bryans") "refinanced their then-existing mortgage loan secured by property at 106 Cameron Square Drive, Evans City, Pennsylvania, with a refinance loan from Rocket Mortgage on or about September 29, 2022." Def. SUMF ¶ 59. In August 2022, the Bryans expressed "desire to refinance their then-existing mortgage loan to pay off over $43,000 in credit card debt and obtain a lower interest rate." *Id.* ¶ 60.

On September 7, 2022, Rocket Mortgage issued the Bryans a "Loan Estimate," which provided the line item for "Title—Notary's Fees $125" under the heading "Services You Can

---

[5]     Plaintiffs maintain that Rocket Close retained the notary fee in all cases, and the arguments are made for each of the closings at issue. *See* Pl. Resp. to Def. SUMF ¶¶ 51, 101, 147–148, 185. Plaintiffs do not dispute that Rocket Close paid Ms. Fox for the September 2022 closing, but dispute that Rocket Close paid Ms. DeRogatis for the November 2022 closing. *See id.* ¶ 51.

Shop For." *Id.* ¶ 61. Mrs. Bryan read the Loan Estimate "pretty carefully," including the $125 notary fee. *Id.* ¶ 62. Mrs. Bryan understood that she and her husband would be charged a $125 notary fee if they proceeded with the refinance. *See id.* ¶ 63. Mr. Bryan testified that he scanned the closing documents but relied on his wife to review the documents "in detail." Craig Bryan Dep. 44:9-21, ECF No. 57-26. Mr. Bryan did not review the Loan Estimate and relied on his wife to review paperwork. *See* Def. SUMF ¶¶ 64–65.

After the Bryans decided to move forward with the mortgage refinance, Rocket Close arranged for a notary, Ms. Fox, to conduct the closing, and provided Ms. Fox with the Bryans' closing documents. *See id.* ¶¶ 66–68. Rocket Close sent the Bryans the same milestone emails that it sent to Ms. Mangle. *See id.* ¶¶ 71–72. On "September 28, 2022, Rocket Mortgage sent the Bryans a letter informing them that their closing was scheduled, providing a list of documents to be signed at closing, and explaining that during the closing, the assigned notary would review the documents, oversee the signing process, and collect any payments due." *Id.* ¶ 73.

Rocket Close sent the Bryans a Closing Disclosure disclosing the $125 notary fee on September 28, 2022. *See id.* ¶¶ 74–75. Mrs. Bryan read the Closing Disclosure, and neither Mr. nor Mrs. Bryan asked any questions about the content of the Closing Disclosure. *See id.* ¶¶ 76–78. Mr. Bryan testified that he "must have" reviewed the Closing Disclosure and "probably would have looked it over," before signing the document.[6] Craig Bryan Dep. 44:15-18; 51:20–52:22. The Bryans received their Settlement Statement, which again contained the notary fee, from Rocket Close on September 29, 2022. *See* Def. SUMF ¶¶ 79–80. Mrs. Bryan read the

---

[6]    Now, Mr. Bryan maintains that he reviewed the closing documents, scanned them, and understood that the closing costs included a notary fee. *See, infra*, Craig Bryan Decl. ECF No. 81-38. This generally comports with his testimony that he understood there was a $125 notary fee that covered many services.

Settlement Statement, understood the notary fee line item and did not ask questions about the fee. *See id.* ¶¶ 81–82. Mr. Bryan alleged that he understood the contents of the Settlement Statement, including the $125 fee. *See* Craig Bryan Dep. 48:24–50:21. The Bryans did not "shop around" for other notaries. Def. SUMF ¶ 84.

"The Bryans' closing occurred remotely on September 29, 2022." *Id.* ¶ 86. Ms. Fox performed many of the same services as she did in Ms. Mangle's closing, including "[n]otariz[ing] the Bryans' signatures." *Id.* ¶ 88. Mrs. Bryan did not ask any questions or object to the notary fee during the closing, *see id.* ¶¶ 89–90, but alleges that she would have objected had she known that the fee "was inflated." Amy Bryan Dep. 86:6–89:8, ECF No. 57-24. "During the closing on September 29, 2022, Mrs. Bryan signed the Closing Disclosure and the Settlement Statement." Def. SUMF ¶ 92. Mr. Bryan did the same. *See id.* ¶ 93.

By signing the Settlement Statement during the closing, the Bryans acknowledged the same statement as above, that it was a "true and accurate statement of all receipts and disbursements."[7] *Id.* ¶ 94. Rocket Close disbursed the $125 fee to itself and paid Ms. Fox for her time, which Plaintiffs dispute came from the $125 notary fee. *See id.* ¶¶ 100–101; *see also* Pl. Resp. to Def. SUMF ¶¶ 100–101; *see also* ECF Nos. 57-30 (Ms. Fox's remittance file); *see also* ECF No. 65-11 (same); *see also* Rea Dep. 147:15–148:25.

### 3.  Amanda and Daniel Hutchinson

#### a.  December 2020 Refinance

Amanda Hutchinson ("Mrs. Hutchinson") and Daniel Hutchinson ("Mr. Hutchinson") (collectively, "the Hutchinsons") "refinanced their then-existing mortgage loan secured by

---

[7]     As noted above, Plaintiffs agree with the content of the Settlement Statement, and only dispute the fact that it did not itemize other fees. *See* Pl. Resp. to Def. SUMF ¶ 94.

property located at 177 Kings Highway, Altoona, Pennsylvania, with a refinance loan from Rocket Mortgage on or about December 11, 2020." Def. SUMF ¶ 107. The Hutchinsons sought "to refinance their then-existing mortgage in order to obtain a lower interest rate and remove private mortgage insurance ("PMI")." *Id.* ¶ 108.

Rocket Mortgage issued a Loan Estimate to the Hutchinsons on November 27, 2020, which disclosed the "Title—Notary's Fees $125" under the "Services You Can Shop For" heading. *Id.* ¶ 109. Mrs. Hutchinson read the Loan Estimate and understood the fee, but Mr. Hutchinson did not read the Loan Estimate and relied on Mrs. Hutchinson's representations. *See id.* ¶¶ 109–111; *see also* Daniel Hutchinson Dep. 37:10–41:10, ECF No. 57-33.[8]

"On . . . November 19, 2020, Rocket Close arranged for Elizabeth Steffy, a duly-licensed and certified notary public, to conduct the closing for the Hutchinsons[.]" Def. SUMF ¶ 114. Rocket Close sent similar milestone emails to the Hutchinsons that it sent to the Bryans and Ms. Mangle. *See id.* ¶¶ 117–118.

"On . . . December 11, 2020, the Hutchinsons received the Closing Disclosure for their refinance transaction." *Id.* ¶ 122. The Closing Disclosure also disclosed the $125 notary fee under the heading "Services Borrower Did Not Shop For." *Id.* ¶ 123. Mrs. Hutchinson read the Closing Disclosure, understood that the Closing Disclosure disclosed the fee, and did not ask any questions about the fee. *See id.* ¶¶ 124–126. Mr. Hutchinson originally maintained that he did not review the Closing Disclosure and did not ask any questions and relied upon Mrs. Hutchinson's representations, *see* Daniel Hutchinson Dep. 52:23–55:8, ECF No. 57-33, but then admitted that he understood that the $125 fee paid for tasks related to the closing. *See id.* 69:5-8.

---

[8]    Mr. Hutchinson now maintains that he understood the notary fee and that it covered many notary services, but contends that had he known that the fee did not itemize any additional fees, he would have objected. *See* Pl. Resp. to Def. SUMF ¶¶ 110–111; *see*, *infra*, ECF No. 81-39.

Also on "December 11, 2020, the Hutchinsons received the Settlement Statement for their refinance transaction." Def. SUMF ¶ 128. The Settlement Statement again disclosed the $125 notary fee, and Mrs. Hutchinson confirmed that she read the line item containing the fee, did not ask any questions about the fee, did not consider the fee in deciding whether to continue the refinance transaction, and did not consider using other notary services providers. *See id.* ¶¶ 130–131, 133–134. Mr. Hutchinson read the acknowledgement, but did not read the notary fee line item, yet he alleged that he understood that the $125 fee covered "all the services that the notary would provide," and understood that he authorized its payment to Rocket Close. Daniel Hutchinson Dep. 48:6-52:3.

"The Hutchinsons' closing occurred in person at their residence on December 11, 2020." Def. SUMF ¶ 135. Ms. Steffy performed the same tasks as mentioned above in the other three Plaintiffs' closings. *See id.* ¶ 137. Mr. and Mrs. Hutchinson reviewed and signed the same Settlement Statement, confirming that all disbursements and receipts were true and accurate and allowing Rocket Close to disburse the funds. *See id.* ¶¶ 140–142. [9]

Rocket Close disbursed the $125 fee to itself and paid Ms. Steffy for her time and services, which Plaintiffs dispute. *See id.* ¶¶ 147–48; *see also* Pl. Resp. to Def. SUMF ¶¶ 147–48; *see also* ECF Nos. 57-37 (Ms. Steffy's first December 2020 remittance file), 57-38 (Ms. Steffy's second December 2020 remittance file); *see also* ECF No. 65-12, 65-13 (same); *see also* Rea Dep. 147:15–148:25. Plaintiffs maintain that "Rocket Close retained the fee to pay and derive benefit therefrom a contractual obligation with third party signing agent." Pl. Resp. to Def. SUMF ¶ 148; *see also* ECF No. 81-5.

---

[9]    As noted above, Plaintiffs agree with the content of the Settlement Statement, and only dispute the fact that it did not itemize other fees. *See* Pl. Resp. to Def. SUMF ¶ 142.

### b.  August 2022 Refinance

In August 2022, "the Hutchinsons discussed with Rocket Mortgage their desire to refinance their 2020 mortgage loan in order to pay approximately $26,000 in credit card and other debt, secure a lower interest rate for that debt, and receive approximately $8,000 in cash for their personal use." Def. SUMF ¶ 150. The Hutchinsons received the same Loan Estimate that they did in their 2020 refinance. *See id.* ¶¶ 151–153. The Hutchinsons understood that there would be a $125 notary fee, as there was in 2020. *See id.* ¶¶ 152–154. Again, Mr. Hutchinson testified that he relied on Mrs. Hutchinson to review the Loan Estimate but agreed to proceed with the refinance. *See* Daniel Hutchinson Dep. 55:22-57:5.

Rocket Close arranged for Ms. Fox to handle the Hutchinsons' 2022 closing. *See* Def. SUMF ¶ 156. Rocket Close again sent the same milestone emails that disclosed the notary fee. *See id.* ¶¶ 159–160. Rocket Close sent the Hutchinsons the Closing Disclosure on August 23, 2022, providing the $125 notary fee, which Mrs. Hutchinson read and both Hutchinsons understood. *See id.* ¶¶ 161–164; *see also* Daniel Hutchinson Dep. 69:5-8, ECF No. 57-33. The Hutchinsons received the Settlement Statement, also containing the $125 notary fee, on August 25, 2022, which Mrs. Hutchinson read and understood. *See* Def. SUMF ¶¶ 165–172; *see also* Amanda Hutchinson Dep. 49:9-25, ECF No. 57-31 (providing that Mrs. Hutchinson believed that the fee covered notary's fees but did not cover "all of the services that a notary provided"). Mr. Hutchinson again read the acknowledgment, but not the rest of the document, yet understood that he would pay notary fees for the "services the notary provided." Daniel Hutchinson Dep. 63:19-65:24. The Hutchinsons did not "shop around" for another notarial services provider. Def. SUMF ¶ 173.

The closing occurred remotely on August 25, 2022. *See id.* ¶ 174. Throughout the closing, Ms. Fox performed the same services that Ms. Steffy had in the Hutchinsons' 2020 closing (and as noted before with the other Plaintiffs). *See id.* ¶ 176. After the closing, the Hutchinsons signed the same Settlement Statement confirming that disbursements were true and accurate and permitting Rocket Close to disburse the funds. [10] *See id.* ¶¶ 179–181.

Rocket Close again disbursed the $125 fee to itself and paid Ms. Fox for her services at the Hutchinsons' 2022 closing, which Plaintiffs dispute. *See id.* ¶¶ 184–185; *see also* Pl. Resp. to Def. SUMF ¶¶ 184–185; *see also* ECF No. 57-41 (Ms. Fox's December 2022 remittance file): *see also* ECF No. 65-14 (same); *see also* Rea Dep. 147:15–148:25. Plaintiffs maintain that "Rocket Close paid a contractual obligation to a third party signing agent." Pl. Resp. to Def. SUMF ¶ 185; *see also* ECF No. 81-5.

### c.   December 2024 Refinance

"On December 28, 2024, and after the filing of this lawsuit, the Hutchinsons closed on a home equity loan with Rocket Mortgage and again used Rocket Close's settlement services in connection with that transaction." Def. SUMF ¶ 186. While Plaintiffs dispute this statement, Plaintiffs maintain "[b]efore the December 28, 2024[,] closing on the home equity loan Amanda Hutchinson obtained, Daniel Hutchinson did not review and relied on my wife to review, the set of documents she received related to the closing." Pl. Resp. to Def. SUMF ¶ 186. The same Closing Disclosure disclosed the $125 notary fee. *See* Def. SUMF ¶ 187. The Hutchinsons were aware of the $125 fee and still proceeded with the refinance. *See* Def. SUMF ¶ 188. The 2024 closing is not at issue in this case. *See generally* Am. Compl.

---

[10]    As noted above, Plaintiffs agree with the content of the Settlement Statement, and only dispute the fact that it did not itemize other fees. *See* Pl. Resp. to Def. SUMF ¶ 181.

### B. Procedural History

Plaintiffs filed the Complaint on November 12, 2024. *See* Compl., ECF No. 1. Then-Defendant, Amrock LLC, filed a Motion to Dismiss the Complaint on December 9, 2024. *See* ECF No. 19. Plaintiffs filed an Amended Complaint on February 10, 2025. *See* Am. Compl., ECF No. 21. The Amended Complaint includes two counts. *See id.* Count I is for unjust enrichment. *See id.* ¶¶ 98–111. Count II is for Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). *See id.* ¶¶ 112–121. Plaintiffs contend that by deliberately charging a notary fee higher than allowed by law and by failing to itemize the notary services, Defendants took advantage of Plaintiffs and were unjustly enriched for more money than they were statutorily entitled to receive. *See id.* ¶¶ 107–110, 117. The Hutchinsons alleged their 2020 refinance for the first time in the Amended Complaint. *See id.* ¶ 31. The Court dismissed the first Motion to Dismiss as moot on February 11, 2025. *See* ECF No. 25.

Amrock LLC filed a Motion to Dismiss the Amended Complaint on February 24, 2025. *See* ECF No. 26. On February 10, 2025, Rocket Close changed its name from Amrock, LLC to Rocket Close, LLC. *See* ECF No. 32. The Court denied the Motion to Dismiss on May 5, 2025. *See* ECF No. 33. Then-Defendant Amrock, LLC was terminated as a Defendant on May 5, 2025, and replaced by Rocket Close. *See id.*

Rocket Close filed a Motion for Summary Judgment on November 7, 2025. *See* Mot. Summ. J., ECF No. 57. Rocket Close filed numerous exhibits with the Motion, which the Court considers in describing the facts of this Motion. *See* ECF Nos. 57, 65.

Plaintiffs filed a Response in Opposition to the Motion for Summary Judgment on December 8, 2025, *see* Resp., ECF No. 81, and attached their supplemental statement of facts, *see* ECF No. 90, and response to Rocket Close's statement of facts, *see* ECF No. 89, both on

December 17, 2025. Plaintiffs also attached two declarations. The first is a declaration by Craig Bryan, wherein he maintains he understood that the closing costs included a $125 notary fee. *See* Craig Bryan Decl., ECF No. 81-38. The second is a declaration by Daniel Hutchinson, wherein he maintains he knew the closing costs in both refinances included the fee. *See* Daniel Hutchinson Decl., ECF No. 81-39. Rocket Close filed its Reply on December 22, 2025. *See* Reply, ECF Nos. 91, 98. Rocket Close responded to Plaintiffs' Statement of Undisputed Material Facts on December 23, 2025. *See* ECF No. 99.

Plaintiffs filed the first Motion for Class Certification on November 7, 2025. *See* ECF No. 59. However, the Court issued an Order requiring Plaintiffs to file a corrected motion properly identifying each exhibit. *See* ECF No. 70. Plaintiffs filed the amended Motion for Class Certification on December 1, 2025. *See* Mot. Class. Cert., ECF No. 73. Rocket Close filed its Response in Opposition on December 8, 2025. *See* Resp. ECF Nos. 79, 82. Plaintiffs filed a Reply in support of the second Motion for Class Certification on December 22, 2025. *See* Reply, ECF Nos. 93, 95.

## III.    LEGAL STANDARDS

### A.  Motion for Summary Judgment – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The court must consider the evidence in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

### B. Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") – Review of Applicable Law

The UTPCPL provides a private cause of action to allow,

> [a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, [to] bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater.

73 P.S. § 201-9.2(a). The UTPCPL's causation requirement "demand[s] a showing of justifiable reliance, not simply a causal connection between the misrepresentation and the harm." *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222 (3d Cir. 2008) (citing *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (2001) (explaining that the UTPCPL requires a plaintiff to allege that he purchased the

product because he heard and believed the defendant's false advertisement)). Subsection (xxi) of

the UTPCPL (the "catch-all" provision) prohibits "[e]ngaging in any other fraudulent or

deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. §

201-2(4)(xxi); *see also Commw. by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d

1010, 1028 (Pa. 2018).

The UTPCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce." *McMahon v. Chipotle Mexican Grill, Inc.*,

Nos. 24-1883 & 24-2042, 2025 WL 1604501, at *4 (3d Cir. June 6, 2025) (citing 73 Pa. C.S. §

201-3). The UTPCPL is a remedy for individual consumers wronged by unfair trade practices, so

courts should liberally construe its provisions to protect consumers. *See Ash v. Cont'l Ins. Co.*,

932 A.2d 877, 881 (Pa. 2007).

"The elements of a [UTPCPL] deception claim are: (1) 'a deceptive act,' meaning

'conduct that is likely to deceive a consumer acting reasonable under similar circumstances'; (2)

'justifiable reliance [based on] the defendants' misrepresentation or deceptive conduct'; and (3)

an 'ascertainable loss' caused by this justifiable reliance." *Landau v. Viridian Energy*, 223 F.

Supp. 3d 401, 418 (E.D. Pa. 2016) (citing *Vassalotti v. Wells Fargo Bank. N.A.*, 732 F. Supp. 2d

503, 510–11 (E.D. Pa. 2010)). "An act or a practice is deceptive or unfair if it has the capacity or

tendency to deceive[,]" but "[n]either the intention to deceive nor actual deception must be

proved; rather, it need only be shown that the acts and practices are capable of being interpreted

in a misleading way." *Commw. ex rel. Corbett v. Peoples Benefit Servs., Inc.*, 923 A.2d 1230,

1236 (Pa. Commw. Ct. 2007) (citations and internal quotations omitted). To prevail, a plaintiff

must prove that he "justifiably relied upon the unfair or deceptive business practice when making

the purchasing decision." *McMahon*, 2025 WL 1604501, at *5 (citing *Gregg v. Ameriprise Fin.,*

*Inc.*, 245 A.3d 637, 646 (Pa. 2021)). "[T]o prove justifiable reliance on 'deceptive conduct during a consumer transaction that creates a likelihood of confusion or misunderstanding,' he must show that he relied on that conduct 'to his ... financial detriment.'" *McMahon*, 2025 WL 1604501, at \*5 (citing *Gregg*, 245 A.3d at 649–50).

Pennsylvania law "holds that a plaintiff can state a claim under the catch-all provision by pleading facts sufficient to support a claim for fraud or deception." *Landau*, 223 F. Supp. 3d at 418 (citations omitted). "Unlike fraud claims, deception claims are not subject to Rule 9(b) and need only comply with the pleading requirements imposed by Rule 8(a)." *Id.* (citing *Slemmer v. McGlaughlin Spray Foam Insulation*, 955 F. Supp. 2d, 452, 463 (E.D. Pa. 2013); *Fazio v. Guardian Life Ins. Co. of Am.*, 62 A.3d 396, 405–06 (Pa. Super. Ct. 2012)).

## C. Unjust Enrichment – Review of Applicable Law

"To state a claim for unjust enrichment under Pennsylvania law, the plaintiff must allege that (1) he conferred a benefit on the defendant, (2) the defendant knew of the benefit and accepted or retained it, and (3) it would be inequitable to allow the defendant to keep the benefit without paying for it." *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203–04 (Pa. Super. Ct. 1999)); *see also Greenwald Caterers Inc. v. Lancaster Host, LLC*, 599 F. Supp. 3d 235, 262 (E.D. Pa. 2022) (citing *Argue v. Triton Digital Inc.*, 734 F. App'x 148, 151 (3d Cir. 2018) (quoting *Mark Hershey Farms, Inc. v. Robinson*, 171 A.3d 810, 817 (Pa. Super. Ct. 2017))). To plead unjust enrichment in a tort claim, the plaintiff must plead facts demonstrating the damages from the tort "could be supported by a theory of unjust enrichment."[11] *Whitaker*, 198 F. Supp. 3d at 492–93 (citing *Zafarana v. Pfizer,*

---

[11]    The quasi-contractual theory of unjust enrichment is "inapplicable when the relationship between parties is founded on a written agreement or express contract." *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448 (Pa. 1969). The existence of a written contract, however, will not

*Inc.*, 724 F. Supp. 2d 545, 561 (E.D. Pa. 2010)). "To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'" *Whitaker*, 198 F. Supp. 3d at 493 (citing *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985) (quoting *Roman Mosaic & Tile Co. v. Vollrath*, 313 A.2d 305, 307 (Pa. Super. Ct. 1973))).

### D. Pennsylvania Notary Public Law

Pennsylvania law sets forth a notary public fee schedule for various notarial acts and provides a $5 fee for notarizing mortgage loan acknowledgments. *See* 4 Pa. Code § 161.1. Pennsylvania law also provides that "[a] notary public may not charge or receive a notary public fee in excess of a fee fixed by the [Department of State]." 57 Pa. C.S. § 329.1.

### E. Voluntary Payment Doctrine

"Under the voluntary payment defense, 'one who has voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him ... cannot recover it back by reason of the payment having been made under a mistake or error as to the applicable rules of law.'" *Liss & Marion, P.C. v. Recordex Acq. Corp.*, 983 A.2d 652, 661 (Pa. 2009) (quoting *In re Kennedy's Estate*, 183 A. 798, 802 (Pa. 1936)); *see also Williams v. Enter. Holdings, Inc.*, No. 12-5531, 2013 WL 1158508, at *2 (E.D. Pa. Mar. 20, 2013) (finding that when a person "voluntarily and without fraud or duress pays money to another with full knowledge of the facts, the money paid cannot be recovered"). "Under

---

bar recovery when an unjust enrichment claim is pleaded as a tort companion. *See Ortiz v. Keystone Premier Settlement Servs., LLC*, No. 23-1509, 2024 WL 3522036, at *6 (M.D. Pa. July 23, 2024); *see also Gahagan v. Penn Abstract & Land Servs., LLC*, No. 24-1921, 2025 WL 1647730, at *2 (M.D. Pa. June 9, 2025) (same). Here, Plaintiffs' unjust enrichment claim is a companion to their UTPCPL claim, as the Court noted in its Order denying the Motion to Dismiss, *see* ECF No. 33, and the existence of a contract does not render recovery unavailable.

Pennsylvania law, duress generally is 'that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness.'" *Abrevaya v. VW Credit Leasing, Ltd.*, No. 09-521, 2009 WL 8466868, at *2 (E.D. Pa. July 22, 2009) (citing *Carrier v. William Penn Broad. Co.,* 233 A.2d 519, 521 (Pa. 1967)). Economic duress is defined as follows:

> To constitute duress or business compulsion there must be more than a mere threat which might possibly result in injury at some future time, such as a threat of injury to credit in the indefinite future. It must be such a threat that, in conjunction with other circumstances and business necessity, the party so coerced fears a loss of business unless he does so enter into the contract as demanded.

*McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 114–15 (Pa. Super. Ct. 2015).

## IV.   ANALYSIS

The primary issues in this case are whether Rocket Close misrepresented the $125 notary fee to Plaintiffs in their respective Closing Disclosures (and their Loan Estimates and Settlement Statements), whether Plaintiffs relied upon the misrepresentation, and whether Rocket Close unlawfully retained the fee. *See* Am. Compl. ¶¶ 43–45, 46.

Plaintiffs allege that the fee only covered the notary's notarizing of Plaintiffs' signatures and exceeded the $5 amount permissible under Pennsylvania law. *See id.* ¶ 41. As a result, Plaintiffs allege that the Closing Disclosures' (and the other closing documents) failure to disclose the other administrative and clerical services in the fee amounted to a misrepresentation, upon which Plaintiffs justifiably relied, in violation of the UTPCPL. Plaintiffs also allege that Rocket Close unlawfully retained the rest of the notary fee (ostensibly $120), which presented unjust enrichment. *See id.* ¶¶ 104, 110. To the extent that Rocket Close provided remittance files of each of the notaries, Plaintiffs maintain that Rocket Close retained the fee to pay and derive benefit from a contractual obligation with a notary. In return, Rocket Close contends that the fee

covered a range of services provided by the notaries, Plaintiffs understood the fee, did not question the fee before the closings, paid the fee voluntarily, and Rocket Close disbursed the fee to the notaries following the closings. *See generally* Mot. Summ. J.

The Court agrees with Rocket Close. Initially, the Court notes that the voluntary payment doctrine bars Plaintiffs' claims. Also, the Court notes that there is no genuine dispute of material fact in this case, and Plaintiffs do not present evidence to support their arguments. Rather, the evidence before the Court shows that Rocket Close repeatedly disclosed the notary fee, even before Plaintiffs received their Closing Disclosures, Plaintiffs agreed to pay the fee, the notaries provided numerous services to Plaintiffs, and Rocket Close paid the notaries from the fee. Thus, the Court grants the Motion for Summary Judgment.

### A. Voluntary Payment Doctrine

The voluntary payment doctrine bars Plaintiffs' claims. Plaintiffs all agree that they paid the $125 notary fee to proceed with the refinance. Rocket Close sent all Plaintiffs numerous pre-closing documents disclosing the fee and what services Plaintiffs could shop for. *See* Def. SUMF ¶¶ 8, 15–16, 61, 71–72, 109, 117–118, 151, 159–160. Plaintiffs also agree that Rocket Close (then called Amrock) could disburse the funds to itself. *See id.* ¶¶ 38, 94, 142, 181. Plaintiffs fail to show that Rocket Close defrauded them in any way. Rather, Plaintiffs chose to use Rocket Close's services. "[M]oney paid voluntarily, although under a mistake of law as to the interpretation of a contract, cannot be recovered." *Acme Markets, Inc. v. Valley View Shopping Ctr., Inc.*, 493 A.2d 736, 737 (Pa. Super. Ct. 1985) (citing *William Sellers & Co. v. Clarke–Harrison, Inc.*, 46 A.2d 497, 499 (Pa. 1946)). Plaintiffs' mistake of law does not support their claims.

Even if the voluntary payment doctrine did not bar Plaintiffs' claims, the Court also finds that there is no genuine dispute of material fact regarding either the UTPCPL or unjust enrichment claims.

### B. UTPCPL

Plaintiffs' UTPCPL claim fails for two primary reasons, both showing lack of deceptive conduct by Rocket Close. First, Plaintiffs fail to provide evidence that the fee only covered notarizing Plaintiffs' signatures. Second, Rocket Close repeatedly disclosed the fee in all three closing documents to all Plaintiffs, which they understood covered many notary services. Deceptive conduct under the catch-all provision of the UTPCPL "'is defined as intentional misleading by falsehood spoken or acted. An act or practice is deceptive or unfair if it has the capacity or tendency to deceive.'" *Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393, 399 (E.D. Pa. 2008) (quoting *Christopher v. First Mut. Corp.*, Civ. A. No. 05–1149, 2006 WL 166566, at *4 (E.D. Pa. Jan. 20, 2006)).

Initially, Plaintiffs' argument that the only notarial service performed was the notarization of Plaintiffs' signatures fails. Although Pennsylvania law permits notaries to charge only $5 for acknowledging a signature, Plaintiffs provide no evidence that Rocket Close's $125 fee was limited to acknowledging signatures. Instead, Plaintiffs all agree that the notaries provided more services in their closings than merely acknowledging Plaintiffs' signatures. *See* Def. SUMF ¶¶ 32, 46, 88, 137, 176. Plaintiffs therefore fail to show that the fee was an overcharge under Pennsylvania law. *See Jones v. Aames Funding Corp.*, No. 04-4799, 2006 WL 2845689, at *11 (E.D. Pa. Mar. 7, 2006) (granting summary judgment in a UTPCPL claim when the plaintiffs failed to present evidence that the defendant violated two state statutes).

Furthermore, Rocket Close openly disclosed the notary fee to Plaintiffs multiple times.

22
062326

First, Ms. Mangle testified that she read and understood the notary fee in the Closing Disclosure, as well as the Loan Estimate and the Settlement Statement. *See* Def. SUMF ¶¶ 8, 9, 20, 21–23, 26–27. She did not ask any questions about the fee before agreeing to proceed. *See id.* ¶¶ 9, 23, 27. She admitted that the notaries assigned to her transactions (Ms. Fox and Ms. DeRogatis) performed multiple services throughout her closing and re-signing, that the notaries should be paid for such services, and that Rocket Close should be paid for its efforts in the closings. *See id.* ¶¶ 32, 46, 54-55. The is no evidence of confusion. *See Parisi v. Wells Fargo Home Mortg., Inc.*, No. 09-2399, 2011 WL 6339835, at \*11–12 (M.D. Pa. Oct. 31, 2011), *report and recommendation adopted*, No. 09-2399, 2011 WL 6370060 (M.D. Pa. Dec. 19, 2011) (granting summary judgment to the defendant in a UTPCPL claim where the plaintiff "admitted [the loan commitment document] did not confuse him"); *Knowles v. Cap. One Bank (USA), N.A.*, No. 11-1257, 2015 WL 3405288, at \*9 (M.D. Pa. May 26, 2015) (granting summary judgment on a UTPCPL claim when the plaintiff did not create "a genuine dispute of material fact that [the defendants] intentionally gave him a false impression as to the quality of their customer service experience when they knew or should have known that impression to be false"). Additionally, Ms. Mangle testified that the notary fee was not the deciding factor in whether to proceed with the refinance, *see* Def. SUMF ¶¶ 28, 56, so there is no evidence of reliance.

Second, Mrs. Hutchinson testified that she read all three closing documents, including the Closing Disclosure, understood the closing costs included the $125 notary fee, and did not ask any questions in either of the two closings. *See* Def. SUMF ¶¶ 109, 122–126, 128, 130–131, 151–152, 161–163, 165–169. She also admitted that Ms. Steffy and Ms. Fox performed numerous services during the closings. *See id.* ¶¶ 137, 176. Mrs. Hutchinson never raised her concerns about a potential overcharge during any of her three closings. Further, with regard to

the 2020 closing, Mrs. Hutchinson testified that the fee was not a factor in her decision to pay. *See id.* ¶ 133. Mrs. Hutchinson does not present evidence that Rocket Close misrepresented the notary fee, that Rocket Close deceived her, or that she relied on any such misrepresentation. Therefore, there is no genuine factual dispute regarding whether Mrs. Hutchinson was confused by Rocket Close's fee. *See Parisi*, 2011 WL 6339835, at *11–12 (granting summary judgment when the plaintiff testified that the terms of his loan did not confuse him).

While Mr. Hutchinson testified that he did not read any disclosures related to the notary fee before either of the two closings, *see* Daniel Hutchinson Dep. 52:9–55:11, 67:1-14, he also admitted that he understood the $125 fee and that it covered numerous notary services in both closings. *See id.* 50:18-23; 51:19-21; 65:1-9; 69:5-8; *see also* Daniel Hutchinson Decl. Even if Mr. Hutchinson did not initially read the closing documents closely, he ultimately understood that he had to pay the $125 fee to proceed with the transactions and understood that it covered notary services in *all three* of his transactions with Rocket Close. Moreover, Mr. Hutchinson could have read the documents and does not provide any evidence that Rocket Close misrepresented the notary fee to him, nor that he relied on the alleged misrepresentation. Therefore, there is no genuine dispute that Mr. Hutchinson was confused by the notary fee.[12] *See Parisi*, 2011 WL 6339835, at *11–12 (granting summary judgment when the plaintiff testified that the terms of his loan did not confuse him).

Third, Mrs. Bryan testified that she understood that the costs included the $125 notary fee. Mrs. Bryan testified that she read the Loan Estimate "pretty carefully," and understood that

---

[12]     The Court also notes that after both presently contested refinancings, the Hutchinsons returned to Rocket Close for a home equity loan. *See* Def. SUMF ¶¶ 186–188. They again paid the $125 notary fee. *See id.* ¶ 187. They do not challenge this conduct. The Court considers this persuasive in finding that the $125 fee did not deceive or mislead the Hutchinsons in either of their two prior closings.

she would be charged the notary fee if she and her husband proceeded with the refinance. Def. SUMF ¶¶ 61–63. She also read the Closing Disclosure, including the fee, understood it, and did not ask any questions about either the Closing Disclosure or the fee. *See id.* ¶¶ 76–77. Mrs. Bryan read and understood the Settlement Statement (disclosing the fee) and again did not ask questions. *See id.* ¶¶ 81–82. Mrs. Bryan testified that she chose to proceed with the loan refinance and authorized the notary fee. *See* Def. SUMF ¶¶ 63, 94. As with the other Plaintiffs, she never raised concerns about a potential overcharge before her closing. She offers no evidence that the fee was a misrepresentation or that it deceived her, much less that she relied on the alleged misrepresentation. Therefore, the undisputed facts show that Mrs. Bryan was not confused by the notary fee. *See Parisi*, 2011 WL 6339835, at *11–12 (granting summary judgment when the plaintiff testified that the terms of his loan did not confuse him).

Next, Mr. Bryan testified at his deposition that he did not review the Loan Estimate, *see* Def. SUMF ¶¶ 64–65, although he did scan the Closing Disclosure generally. *See* Craig Bryan Dep. 51:20–52:22. However, Mr. Bryan maintained at his deposition and in his declaration that he understood the contents of the closing documents, particularly the Settlement Statement, which included the $125 fee. *See* Craig Bryan Dep. 48:24–49:1; *see also* Craig Bryan Decl. Bryan understood that the fee covered many notary services beyond notarizing his signature. Thus, he does not present any evidence of any misrepresentation of the fee, that the misrepresentation deceived him, or that he relied upon such misrepresentation. There is no genuine factual dispute regarding whether Mr. Bryan was confused about the notary fee. *See Parisi*, 2011 WL 6339835, at *11–12 (granting summary judgment when the plaintiff testified that the terms of his loan did not confuse him).

Not only do Plaintiffs fail to provide evidence of confusion, but they also fail to provide evidence that Rocket Close misrepresented the notary fee. Where there is no misrepresentation, there can be no UTPCPL claim. In *Dukich v. IKEA US Retail LLC*, the court found that the defendant, retail store IKEA, did not make any deceptive or misleading statements in violation of the UTPCPL with regard to its return policy. *See* No. 20-2182, 2022 WL 4237485, at *4 (E.D. Pa. Sept. 13, 2022). In *Dukich*, IKEA sent an email to customers that, following a recall, stating that it would provide:

> 1) a full refund if the chest or dresser was manufactured between January 1, 2002 and June 28, 2016; 2) a store credit for 50% of the original purchase price if the product was manufactured before January 2002; or 3) a $50 store credit if the date stamp is unidentifiable.

*Id.* at *2. One set of plaintiffs maintained that IKEA did not provide them with a refund after they tried to return the recalled item and IKEA only offered them a store credit. *See id.* In granting summary judgment, the court noted that IKEA offered store credit, pursuant to the email, and provided the plaintiffs another item, also in accordance with the policy. *See id.* at *4. The Court thus found that there was no misrepresentation; the plaintiffs received what IKEA told them they may receive. *See id.* Here, Rocket Close also provided the notary fee in numerous documents and did not misrepresent that it was anything more than a general notary fee. The fee said what it was: a $125 notary fee. That Rocket Close did not explicitly itemize the notary fee regarding all services the notaries provided does not mean that Rocket Close misrepresented the fee. Simply put, Rocket Close did not represent that the fee was *only* for notarizing Plaintiffs' signatures. As the Court finds that there is no misrepresentation, the Court likewise finds that Plaintiffs cannot have justifiably relied on a misrepresentation. Therefore, Plaintiffs' UTPCPL claim fails.

The Court grants summary judgment to Rocket Close on Count II.

### C. Unjust Enrichment

Correspondingly, because there is no dispute that Rocket Close provided notary services beyond notarizing signatures, Plaintiffs have failed to show that Rocket Close unjustly secured the notary fees.[13] Moreover, Rocket Close did not retain any part of the fees; rather, they provided remittance files from each notary. *See* ECF Nos. 57-22, 57-23, 57-30, 57-37, 57-38; *see also* ECF Nos. 65-9, 65-10, 65-11, 65-12, 65-13, 65-14. By providing the remittance files, Rocket Close provided evidence that these notaries were compensated for their services and received more than the $5 Plaintiffs maintain that Rocket Close is entitled to for merely notarizing signatures. Although Plaintiffs raise Karyn Rea's deposition testimony that Rocket Close charged a flat fee for services and provided numerous services to present a factual dispute, they fail to present facts in support of their argument, all the while maintaining that they paid the flat fee. *See* Pl. Resp. to Def. SUMF ¶¶ 51–52 (Ms. Mangle's citation to Rea's deposition, without additional factual support that Rocket Close unjustly retained any part of the fee); Pl. Resp. to Def. SUMF ¶¶ 147–148, 184–185 (the Hutchinsons' citation to Rea's deposition, also failing to provide factual support). Plaintiffs also argue that Rocket Close retained the fee to derive a benefit from its contractual obligations, *see* Pl. Resp. to Def. SUMF ¶¶ 52, 148, 185, but

---

[13]    Rocket Close maintains that because Plaintiffs did not meaningfully respond to the unjust enrichment arguments, the claim is considered waived. Courts in the Third Circuit have found that waiver is "a necessary corollary" to the principle that summary judgment is appropriate where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Skirpan v. Pinnacle Health Hosps.,* No. 07-1703, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010) (quoting *Celotex,* 477 U.S. at 322). Therefore, when a plaintiff responds to a defendant's summary judgment motion but fails to address the substance of any challenge to some of the claims, that failure "constitutes an abandonment of th[o]se causes of action and essentially acts as a waiver of these issues." *Skirpan,* 2010 WL 3632536, at *6; *see also, e.g., Brenner v. Twp. of Moorestown,* No. 09–219, 2011 WL 1882394, at *11 (D.N.J. May 17, 2011) (collecting cases). Here, however, because the Plaintiffs' Response to Rocket Close's Statement of Undisputed Material Facts (and their own Statement of Facts) addresses their unjust enrichment arguments, the Court considers the unjust enrichment claim.

provide no evidence to support this contention beyond pointing to a general signing agent agreement that only addresses the notaries' compensation, *see* ECF No. 81-5. The agreement does not show that Rocket Close kept any of the $125 fee: it only shows that Rocket Close could (and did) charge the fee. Ultimately, the Court finds that there is no genuine dispute of fact that Rocket Close paid the notaries from the $125 fee and did not retain the benefit in any of the closings. *See Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, 417 F. Supp. 3d 531, 565 (E.D. Pa. 2019) (granting summary judgment on an unjust enrichment claim because the plaintiffs "failed to 'identify any fund retained by [GSK] to which a common law equitable remedy would apply'") *(citing Commw. v. Ortho-McNeil-Janssen Pharm.*, 52 A.3d 498, 513 (Pa. Commw. Ct. 2012)); *see also Bigsby v. Barclays Cap. Real Est., Inc.*, 391 F. Supp. 3d 336, 346 (S.D.N.Y. 2019), *aff'd*, 841 F. App'x 331 (2d Cir. 2021) (noting that the "plaintiffs have presented no evidence that the defendant retained fees from the plaintiffs in excess of the fees that the defendant actually paid out to the intermediaries").

The Court also notes that the Hutchinsons' unjust enrichment claim based upon their December 11, 2020 refinance is time-barred. Under Pennsylvania law, the statute of limitations for an unjust enrichment action is four years. *See Colonial Assur. Co. v. Mercantile & Gen. Reins. Co.*, 297 F. Supp. 2d 764, 771 (E.D. Pa. 2003), *aff'd sub nom. Colonial Assur. v. Mercantile & Gen. Reins. Co.*, 130 F. App'x 607 (3d Cir. 2005) (citing *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997)); *see also* 42 Pa. C.S. § 5525(4) (providing that an action upon a contract implied in law, defined by *Cole* to include unjust enrichment actions, has a four-year statute of limitations). The Hutchinsons did not assert their unjust enrichment claim regarding the 2020 refinance until filing their Amended Complaint on February 10, 2025. Although Federal Rule of Civil Procedure 15(c)(1)(B) provides that pleading

amendments relate back to the date of the original pleading when the claim asserted in the amended plea "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading[,]" Fed R. Civ. P. 15(c)(1)(B), here, the Hutchinsons did not raise the 2020 refinance in the original Complaint. *See* Compl. An amended pleading "does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005) (relating to a habeas petition); *see also Farrell v. Eineman*, No. 04-2088, 2006 WL 5164064, at *1–2 (D.N.J. Aug. 28, 2006) (applying the rule in *Mayle* to civil complaints and finding that the new allegation did not occur at the same time as the original pleading, therefore did not "relate back" to the original pleading). Although the Amended Complaint refers to the same type of conduct, the $125 notary fee on the closing documents, the original Complaint did not put Rocket Close on notice of the Hutchinsons' refinance in 2020. *See Glover v. F.D.I.C.*, 698 F.3d 139, 146 (3d Cir. 2012) ("[W]e cannot agree that Glover's original Complaint adequately notified the Udren Defendants of the basis for liability asserted against them in the amended FDCPA claim because it did not arise from the factual occurrences which, fairly construed, implicated the Udren Defendants in her first pleading."); *see also Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984) (holding that Rule 15(c) is premised on the theory that "a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide"). By only raising the claim in February 2025, over four years after December 2020, the Hutchinsons' unjust enrichment claim based upon their 2020 refinance is time-barred.

The Court grants summary judgment to Rocket Close on Count I.

## V.    CONCLUSION

For the foregoing reasons, the Court grants Rocket Close's Motion for Summary Judgment. Initially, the voluntary payment doctrine bars Plaintiffs' claims. Additionally, the Court finds that Plaintiffs fail to provide evidence to present a genuine dispute of material fact on both their unjust enrichment claim and their UTPCPL claim. Also, the Court finds that the Hutchinsons' unjust enrichment claim based upon their 2020 loan refinancing is time-barred. The Court orders judgment to be entered in favor of Rocket Close. Since entering judgment closes the case, the Court also dismisses both of Plaintiffs' pending Motions for Class Certification.

A separate Order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge